## NEW YORK COMMON PLEAS.

PHILIP CASWELL and others agt. THOMAS DAVIS.

A person who forms a new composition, and invents a *new word* to characterize it, is entitled to be protected in the exclusive use of such *word* as his trade-mark, and an injunction will issue to restrain others from appropriating it to designate a similar article.

Plaintiff had invented a "new medicine," and formed the compound word "*Ferro-Phosphorated*" to designate it. Such combined word was *new*.

*Held*, that he was entitled to the exclusive use of such compound word, and that others could be restrained by injunction from using it.

*Special Term, December*, 1867.
MOTION to dissolve injunction.

J. D. BILLINGS, *for motion.*
PARIS G. CLARK, *opposed.*

VAN VORST, J.   The claim of the plaintiffs in this action is, that the name affixed by them to the medicine which was first compounded by them in 1861, "Ferro-Phosphorated Elixir of Calisaya Bark," is the subject of a trade mark, and that it is their property by priority of adoption, and cannot be appropriated by any other persons, to any article similar to the one manufactured by them.

The plaintiffs do not seek to enjoin the defendant from manufacturing and selling his compound, or any other mixture composed of any elements, but they insist that he shall not sell it with a label bearing upon it the name "Ferro-Phosphorated Elixir of Calisaya Bark."

The medicine, which the plaintiffs claim to be so useful and healthful in its application as a remedial agent, and to be a source of great profit to them, was first prepared in their establishment with their own materials, by themselves and their clerk Coffin, under their directions.

The name by which it is designated was composed and

applied to it first by them. Whatever Coffin did in the matter, whatever inventive skill he exhibited or experiments he performed, in this preparation, was under their advisement, as a clerk in their employment, and for the benefit of his principals.

The recipe for the composition was the property of the plaintiffs, as was the name *invented and applied,* if the name adopted can be the subject of property.

There was some evidence tending to show that similar preparatiɔns, in some of their essential elements, had been made and were in use before the plaintiffs experimented on or produced their article; but it is not established that any mixture composed of all the ingredients used by plaintiffs, or having a name in all respects similar to that adopted and applied by plaintiffs, was in use or known to the public before the plaintiffs introduced their medicine.

The Elixir of Calisaya or Peruvian Bark was in use, and perhaps in solution with iron in some form.

But this case shows that this composition, with its particular and specific substances, was first introduced by the plaintiffs under its peculiar name, "Ferro-Phosphorated Elixir of Calisaya Bark," and that they first applied the specific words, "ferro-phosphorated," in composition, to any medicine.

The question presented is, is this name, as combined and arranged by plaintiffs, the subject of a trade mark, and can they be protected in its exclusive use.

The case of *Wolfe* agt. *Goulard* (18 *How. R. p.* 64), is a leading one on this particular branch of the law of trade marks.

Mr. Justice INGRAHAM, who delivered the opinion in that case, says "that when a person forms a new word to designate an article made by him, which has never been used before, he may obtain such a right to that name as to entitle him to the sole use of it as against others who attempt to use it for a similar article. But such an exclusive right can

never be successfully claimed of words in common use previously, as applicable to similar articles."

In the case of *Burnett* agt. *Phalon* (9 *Bosw. R.* 192), Mr. Justice PIERREPONT says: "No one can appropriate a word in general use as his trade mark, and restrain others from using that word."

In considering the case before the court in the light of these authorities, two facts are to be regarded:

The article composed by plaintiffs as a whole was original with them. In the condition it was presented to the public; it was new. As it was a recent composition, it would of necessity require a characteristic name, if its elements were to be indicated in its appellation. Compounded of substances known principally to chemistry, which science has a nomenclature peculiar to itself, the words to distinguish it would be in a language familiar to chemists and that limited class of persons who deal in drugs and chemicals.

It is true that the meaning of the words singly, which mark the compound in question, is known to a large class of persons other than those designated; but as far as the word "*ferro-phosphorated*" is concerned, it cannot be said that it is in common or general use, or that it is even understood by the great number of persons who take the remedy on the advice of a physician, as indicating the true nature and character of the mixture, unless the general advice and direction of the physician may suggest it.

Such persons may, and doubtless do in most cases, understand that the medicine ordered contains Peruvian bark and iron; but as they read the label on the bottle, they do not learn from it what the article really is, although its elements are generally indicated by the words used.

They are not like words in general or common use, in any true sense, which carry to the mind of all classes, instantly the eye lights on them, the true character of the contents of the package upon which they are placed.

All understand what the words "tobacco," "gin," "brandy,"

"cotton yarn," mean; but the words "Ferro-Phosphorated Elixir of Calisaya Bark" would in general be unintelligible to most persons.

I am not certain that the distinction I have taken in respect to the particular words in this case, provided the words be strictly and in chemical· language correct, removes it from the principles so well considered and clearly established in the cases of *Wolfe* agt. *Goulard*, or *Burnett* agt. *Phalon*.

But the views above expressed, it appears to me, apply with great force to the words "ferro-phosphorated."

There is nothing to show that this *compound word* was ever used, before it was so applied by plaintiffs, to indicate any preparation, and I have been referred to no book in any language in which it can be found; I have resorted to several chemical works and medical dictionaries, and find no such compound word. "Ferrum," of which "ferro" is a form, is a common word in the Latin; and "phosphorated" is recognized by Webster as an English word.

But I am of the opinion that no such word as "ferro" and "phosphorated," in combination, is to be found in any language, except the forming of it by plaintiffs has had the effect to introduce it, and if so, plaintiffs are entitled to the credit and use of it. The combined word, I am satisfied, is philologically incorrect. I do not suggest that the word is meaningless, or that its elements do not indicate in a general way some of the ingredients of the preparation, but it does not do so chemically, or in an exact sense, and was doubtless arbitrarily invented and arranged by plaintiffs.

In the case of *Burnett* agt. *Phalon*, the plaintiff had adopted as a trade mark the word "*Cocoaine*," to designate a compound prepared by him in part from *cocoa nut oil*. It was upheld on the ground that Burnett had contrived a name unknown to any language, and sold his mixture under that appropriate designation.

The defendant in that case urged that the word used by plaintiffs was compounded from the French.

I think it fairly to be inferred from the facts of that case, as they are reported, that Burnett meant by the word " *Cocoaine* " to indicate to the public the presence of *cocoa nut oil* in his mixture.

I think in this regard there is an analogy between the case of *Burnett* agt. *Phalon* and the one before the court; the latter case is scarcely more strongly characterized than the former. The word " ferro-phosphorated" was *invented and applied* by plaintiffs.

In disposing of this case, we should not loose sight of the fact that the affidavits of several physicians were read on the hearing, from which it appeared that they have used this remedy in their practice for several years, and that when they prescribe " Ferro-Phosphorated Elixir of Calisaya Bark," they intend the medicine manufactured and sold by plaintiffs of that name.

The defendant was in the employment of plaintiffs at the time the experiments were performed which resulted in the production of their article. He was a helper in plaintiff's manufactory, and learned from the clerk, Coffin, who had the charge of the department, the composition of the article, and the substances used in its preparation.

Defendant subsequently left the employment of plaintiff, and commenced the manufacture and sale of a medicine according to the recipe communicated to him by the clerk, while they were together with plaintiffs.

He puts up the same in bottles about the size used by plaintiffs, with a label thereon as follows: "Davis & Son's original and genuine 'Ferro-Phosphorated Elixir of Calisaya Bark,'" which acts plaintiffs claim are intended to induce the belief that the medicine offered by defendant is the same originated and prepared by plaintiffs, and that persons have been deceived and plaintiffs injured thereby.

I have come to the conclusion, upon the facts of this case,

that the plaintiffs are entitled to the exclusive use of the word "*Ferro-Phosphorated*," alone or in combination with any other words, and that their label to that extent is a proper subject of a trade mark.

I do not think that as to the words "*Elixir of Calisaya Bark*," which are well known and in general use, they are so entitled.

The motion to dissolve this injunction is denied, with liberty to the defendant to aply for a modification of it, in pursuance of the principles announced herein.